UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TERRENCE ARMSTRONG,

                           **Plaintiff,**

           *- against -*

CAROLYN W. COLVIN,
**Acting Commissioner of Social Security,**

                        **Defendant.**

12 Civ. 8126 (VB)(PED)

**REPORT AND
RECOMMENDATION**

TO:   **THE HONORABLE VINCENT L. BRICCETTI
       UNITED STATES DISTRICT JUDGE**

## I.  INTRODUCTION

Plaintiff Terrence Armstrong, proceeding *pro se*, brings this action pursuant to 42 U.S.C.

§ 405(g) challenging the decision of the Commissioner of Social Security (the "Commissioner")

denying his application for benefits on the ground that he is not disabled within the meaning of

the Social Security Act (the "Act"), 42 U.S.C. §§ 423 *et seq.*

Presently before this Court, pursuant to an order of reference, Dkt. No. 7, is the

Commissioner's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure.  Dkt. Nos. 16 (Defendant's Notice of Mot.), 17 (Defendant's

Memorandum of Law ("Def.'s Mem.")).  Because Plaintiff's Memorandum of Law in Opposition

to the Defendant's Motion, Dkt. No. 23 ("Pl.'s Mem."), affirmatively urges this Court to vacate

and reverse the Commissioner's decision, Plaintiff's filing will be treated as a motion for

judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c).[1]  For the reasons set forth below, I

respectfully recommend that Plaintiff's Motion for Judgment on the Pleadings be **GRANTED**,

Defendant's Motion for Judgment on the Pleadings be **DENIED**, and this case be remanded

pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings.

## II. BACKGROUND

### A.      Plaintiff's Application for Social Security Benefits

Plaintiff applied for Supplemental Security Income ("SSI") benefits on May 27, 2009,

and Disability Insurance Benefits ("DIB") on June 4, 2009. R 78–79, 95–107, 111–36.[2]  In his

applications, Plaintiff, who was born in January 1974 and was thirty-five years old at the time he

applied for benefits, claimed that he had been disabled and unable to work since June 30, 2008

due to depression, a foot fracture, sciatica and post-traumatic stress disorder ("PTSD").  R

78–79, 95–107, 111–36.  Plaintiff's applications indicated a varied work history, including jobs

as a bank teller, betting clerk, dishwasher, parks enforcement employee and retail worker.  R.

113.  Plaintiff also held a long-term job as a bike messenger from September 1995 through June

2007 and had most recently been employed as a laborer through a temporary staffing agency

from June 2005 through June 2008.  R. 113.   In terms of his current daily activities, Plaintiff

noted that he was able to bathe, prepare meals, care for his cat, clean, shop for groceries and

watch television.  R. 119–26.

---

[1] "Although a remand request is normally made by a party, there is no reason why a court may not order the remand *sua sponte*."  Clark v.. Callahan, No. 96 Civ. 3020 (SAS), 1998 WL 512956, at *1 (S.D.N.Y. Aug.17, 1998) (internal quotation marks omitted).

Copies of unreported cases will be mailed to the *pro se* plaintiff.  See Lebron v. Sanders, 557 F.3d 76 (2d Cir. 2009).

[2] Citations to "R. __" refer to the administrative record that was filed with the Commissioner's answer.  Dkt. No. 11.

Plaintiff's applications were denied by the Social Security Administration ("SSA") on September 15, 2009, on the basis that none of his conditions were severe enough to prevent him from working. R. 79–84.

## B.   **Medical Evidence**

### 1.   *Treatment History*

The record evidence concerning plaintiff's medical history is sparse.  The only medical evidence that appears in the record from before plaintiff's alleged onset date is a report from Dr. Carol McLean-Long on Renaissance Health Care Network letterhead, dated March 23, 1996, indicating that Plaintiff was treated for a fall from a bike in which he strained his left knee and index finger and suffered abrasions.  R. 266.

The next evidence, from October 3 through October 10, 2008, shows that Plaintiff underwent a "biopsychosocial" evaluation at the Institute for Family Health in Manhattan, operated within the FEGS Health and Human Services System ("FEGS Report").  See R. 153–167.  The FEGS report indicates that Plaintiff lived alone on the fifth floor of an apartment building in Manhattan.  R. 155.  A case manager noted that Plaintiff had a stable work history, that he had last worked in June 2008, and that he reported experience as a laborer and construction worker.  R. 165.  Plaintiff also reported a history of legal problems; he stated that he had been "arrested in the past due to a misdemeanor," but that he did not have any problems at the present.  R. 157.  Kollie Saygbe, a social worker, noted that Plaintiff reported alcohol abuse issues but that he denied problems with other drugs.  R. 157–58.  Plaintiff stated to Ms. Saygbe that he used alcohol 2–3 times per week, and had, in fact, consumed 60 ounces of beer on October 2, 2008, the day before he met with Ms. Saygbe.  R. 158.

Ms. Saygbe conducted a mental status examination of Plaintiff.  R. 158.  Plaintiff

reported that he had never received treatment "for Nerves, Depression, or an Emotional

Problem," and that he was not currently receiving mental health treatment.  R. 158.  He stated

that he had never thought about hurting himself or others, and accordingly, had never tried to do

so.  R. 158.  Plaintiff reported that he felt "down, depressed or hopeless" and that he felt "tired or

[had] little energy" for "several days" over the previous two weeks.  R. 158.  However, with

respect to all other problems, Plaintiff reported that he was "not at all" bothered.  R. 158.

Plaintiff stated that the problems he was experiencing made it "somewhat difficult" to do his

work, take care of things at home and get along with other people.  R. 159.  Ms. Saygbe assessed

Plaintiff with a PHQ-9 score of 2,[3] wrote that his depression severity was "none," and thus,

recommended no treatment.  Ms. Saygbe noted that plaintiff attributed his depression "to being

unemployed."  R. 159.

The FEGS report states that Plaintiff had no travel limitations and was able to travel

independently by bus and train.  R. 159.  With respect to other daily activities, Plaintiff reported

that he was able to wash dishes, wash clothes, sweep and mop the floor, vacuum, watch

television, make beds, shop and cook, read, socialize, get dressed, bathe, use the bathroom and

groom himself.  R. 160.  Plaintiff also reported that he had friends and family that he could rely

on for emotional support.  R. 160.  Plaintiff stated that he was currently "searching for

employment," but that he could "no longer perform the jobs he once held because of his back

_____

[3] "PHQ–9 stands for 'Patient Health Questionnaire' and is used to assess and monitor the
severity of a patient's depression and/or anxiety.  A score of 5–10 indicates mild depression,
11–15 indicates moderate depression, 16–20 indicates moderately severe depression, and 21+
indicates severe depression." Rodriguez v. Astrue, 12-CV-300, 2013 WL 1225394, at *7 n.7
(E.D.N.Y. Mar. 27, 2013).

4

injury." R. 160.  Plaintiff also reported a "history of back injury, joint pains, and strained right shoulder." R. 161.

The FEGS report also contains the results of a physical examination conducted by Dr. Lori Rosenblum. R. 161–67.  Dr. Rosenblum noted that Plaintiff had a history of lower back pain and that he was currently taking no medication. R. 161.   She wrote that Plaintiff was a current smoker and had smoked one pack of cigarettes daily for over ten years. R. 162.   With respect to Plaintiff's musculoskeletal system, Dr. Rosenblum noted that Plaintiff had lower back pain beginning in 2007, "still ha[d] pain with exertional activities," although Plaintiff denied radiation or numbness, and that Plaintiff had a history of right shoulder injury. R. 164.  Concerning Plaintiff's emotional/psychiatric system, Dr. Rosenblum noted a history of mild depression. R. 164.  Upon physical examination, Dr. Rosenblum made the following findings: "Abnormal Spine; Abnormal [right upper extremity]; Tenderness, Edema[4], Swelling; No Full Range of Motion, Contractures[5] Present; – tenderness on palpation of [right] sacral iliac joint. [negative] straight leg lift." R. 164.   Plaintiff's pain was described as a 6 (presumably on a scale of 10). R. 164.

With respect to Plaintiff's capacity to do work, Dr. Rosenblum stated that, during an 8 hour workday, Plaintiff could sit for 6–8 hours, stand for 4–5 hours, walk for 4–5 hours, pull for 1–3 hours, kneel for 1–3 hours, reach for 1–3 hours and grasp for 6–8 hours. R. 165.  Plaintiff would be unable to climb or bend for any amount of time. R. 165.  Plaintiff could lift, carry or

---

[4] An edema is "[a]n accumulation of an excessive amount of watery fluid in cells or intercellular tissues."  Stedman's Medical Dictionary 124770 (27th ed. 2000) ("Stedman's").

[5] A contracture is "[s]tatic muscle shortening due to tonic spasm or fibrosis, to loss of muscular balance, the antagonists being paralyzed or to a loss of motion of the adjacent joint." Stedman's at 89800.

push weights of less than 10 pounds 15 or more times per hour, lift or carry weights of 10–20 pounds 1–10 times per hour, and push weights of 10–20 pounds 10–15 times per hour.  R. 165. Plaintiff was unable to lift, carry or push any weights greater than 20 pounds.  R. 165.   Dr. Rosenblum diagnosed Plaintiff with sciatica and a history of right shoulder injury.  R. 166.  She recommended vocational rehabilitation "with the above limitations to avoid strenuous activities." Tr. 167.

On November 6, 2009, an "Order Audit Trail Report" from Metropolitan Hospital Center in Manhattan indicates that Dr. Lily Lam referred Plaintiff to a drug rehabilitation clinic.  R. 208. Dr. Lam noted that Plaintiff had ten prior visits.  R. 208.  Dr. Lam also noted that Plaintiff had chronic low back pain and that he was applying for SSI.  R. 208.

A letter to Plaintiff from Beth Rabinove, a licenced social worker at Union Settlement Association, dated December 1, 2009, indicates that Plaintiff's case was being closed due to Plaintiff's failure to attend a treatment session.  R. 210.  Ms. Rabinove remarked that Plaintiff had expressed interest in treatment for his "substance abuse problem" and enclosed a list of drug treatment programs "if your referral to Metropolitan Hospital drug treatment program doesn't meet your needs."  R. 210.

On August 31, 2010, the City of New York Human Resources Administration referred Plaintiff for a mandatory appointment with the Substance Abuse Service Center in connection with his continued receipt of public assistance benefits.  R. 217.   Plaintiff attended his appointment, where he reportedly began the admission process into a treatment program; a follow-up appointment was scheduled for September 2, 2010.  R. 218.

On September 29, 2010, Plaintiff visited Harlem East Life Plan Medical Facility in Manhattan and was referred to the rehabilitation clinic of Mt. Sinai Medical Center.  R. 209.

6

The referring clinician, whose signature is illegible, noted that Plaintiff had a history of chronic lower back pain.  R. 209.

On October 6, 2010, Plaintiff underwent a magnetic resonance imaging ("MRI") of his left ankle and right foot.  R. 212–13.  Dr. Satish Chandra noted that Plaintiff's left ankle was "[r]elatively unremarkable."  R. 212.  With respect to Plaintiff's right foot, Dr. Chandra noted "[m]ild arthropathy of the first metatarsophalangeal joint."  R. 213.

Several service authorization reports from Healthfirst, "a not-for-profit managed care organization,"[6] appear in the record.  R. 214.  A report dated October 21, 2009, identifies Dr. Lam as Plaintiff's primary care physician and indicates that Plaintiff would receive unspecified treatment at the James Weldon Johnson Counseling Center between October 21, 2009, and November 21, 2009.  R. 249.  A service authorization report dated October 27, 2010 again identifies Dr. Lam as Plaintiff's primary care physician and indicates that he would receive unspecified treatment at Northside Center for Child Development between October 27, 2010, and November 27, 2010.  R. 214, repeated at R. 250.  Reports dated December 10 and December 20, 2010, indicate that Plaintiff would receive treatment from Dr. Lam between November 27, 2010, and May 27, 2011, in the form of "pharmacologic management" and "individual psychotherapy."  R. 215, 251–52.

On December 15, 2010, Plaintiff visited Metropolitan Hospital Center and vaccinated for the flu and hepatitis B.  R. 265.  Plaintiff was advised to follow up in three weeks.  R. 265.

A letter to Plaintiff from Jennifer Hogan, a licensed social worker at Northside Center for Child Development, dated January 5, 2011, indicates that Plaintiff had missed treatment sessions

---

[6] About Healthfirst, http://www.healthfirstny.org/about-healthfirst.html (last visited Oct. 15, 2013).

and that if he did not attend a session scheduled for January 11, his case would be closed.  R.

211.  A follow-up later dated January 25, 2011, also from Ms. Hogan, indicates that Plaintiff did

not attend his January 11 appointment and that, consequently, his case was being closed.  R. 248.

On February 26, 2011, Plaintiff was again referred by the Human Resources

Administration to a mandatory treatment program in connection with his continued eligibility for

public assistance benefits.  R. 253.  Plaintiff did not appear for his intake appointment, resulting

in the discontinuance of his public assistance benefits on April 2, 2011.  Tr. 254.

2.    *Consultative Examinations*

a.    Internal Medical Examination

On August 10, 2009, Plaintiff underwent a consultative internal medical examination

with Dr. Rahel Eyassu of Industrial Medicine Associates, P.C.  R. 172.  Plaintiff complained to

Dr. Eyassu of chronic right foot and left ankle pain, the result of a right foot fracture and

unspecified left ankle "trauma," respectively.  R. 172.  Plaintiff stated that he heard a "cracking"

sound in his left ankle when walking.  R. 172.   Dr. Eyassu noted that Plaintiff had "a history of

right-side sciatica since 2007 that is exacerbated with strenuous activity," as well as "a history of

PTSD and depression."  R. 172.  Plaintiff was taking no medication.  R. 172.

Regarding Plaintiff's social history, Dr. Eyassu noted that Plaintiff had started smoking

cigarettes, drinking beer and using marijuana in 1994, and that he continued to smoke one pack

of cigarettes, drink 22 to 66 ounces of beer and smoke "one to two joints" daily.  R. 172.

With respect to Plaintiff's activities of daily living, Dr. Eyassu noted that Plaintiff cooked

three times weekly, and cleaned, laundered and shopped once weekly.  R. 172.  He further noted

that Plaintiff was able to shower and dress himself, and that he enjoyed watching television.  R.

172.

Upon physical examination, Dr. Eyassu noted only the following abnormalities: "Left ankle pain on ROM. Dorsiflexion[7] left was 4+/5." R. 173. He diagnosed Plaintiff with (1) chronic left ankle pain, (2) right foot pain, (3) history of sciatica, (4) PTSD and (5) depression. R. 174. His prognosis was "[g]ood, except for #4 and #5. Please see psychology evaluation." R. 174. For his Medical Source Statement, Dr. Eyassu wrote that Plaintiff had no limitations for "squatting, standing, reaching up, pulling, pushing, [and] handling." R. 174.

  b.  <u>Psychological Examination</u>

On August 10, 2009, Plaintiff also underwent a consultative psychological evaluation with Dr. Haruyo Fujiwaki of Industrial Medicine Associates, P.C. R. 175. Plaintiff told Dr. Fujiwaki that he had last worked in June 2008 "doing manual labor such as construction, moving and loading," but had stopped working because of "back problems and lack of work." R. 175. Plaintiff reported that he had never been hospitalized for psychiatric reasons, but had seen a psychiatrist in 2002 "for a few months." R. 175. Dr. Fujiwaki noted that "[t]his treatment was recommended by [Plaintiff's] lawyer because he was involved in a court case." R. 175.

Plaintiff reported that he had "frequent wakening," loss of appetite and that he had "experienced depression since 2000 when he was arrested by police and jailed for three days." R. 175. Plaintiff's 2000 arrest caused him to become anxious and irritable, and he started to use more drugs in an attempt to alleviate his pain. R. 175.

Under "Drug and Alcohol History," Dr. Fujiwaki noted that Plaintiff had consumed three 22-ounce cans of beer and smoked "two blunts of marijuana" the previous Saturday. R. 176. Dr. Fujiwaki further stated that Plaintiff drank alcohol when he could afford it and that, in 2005,

---

  [7] Dorsiflexion is "[u]pward movement (extension) of the foot or toes or of the hand or fingers." <u>Stedman's</u> at 118890.

he had received drug treatment at North General.  R. 176.  Under "Family History," Dr. Fujiwaki

noted "[p]ositive for substance abuse problems."  R. 176.

Dr. Fujiwaki conducted a mental status examination of Plaintiff, and noted no unusual

findings.  R. 176–77.  Plaintiff reported that he was able to dress, bathe, groom himself, cook,

clean, do laundry and shop for food, but that he had difficulty with managing money.  R. 177.

Plaintiff also reported that he sometimes socialized and that he had one friend.  R. 177.  Dr.

Fujiwaki noted that Plaintiff "spen[t] his days watching TV and sometimes he goes out to find

metal cars." R. 177.

Dr. Fujiwaki provided the following Medical Source Statement:

> Vocationally, the claimant is able to follow and understand simple directions and
> instructions.  He can perform simple tasks independently.  He can maintain
> attention and concentration.  He is able to maintain a regular schedule with some
> difficulty due to substance abuse problems.  He can learn new tasks.  He can
> perform complex tasks.  He appears to be able to relate adequately with others.
> He is not capable of dealing with stress and needs supervision.  He can relate with
> others and deal with stress to a certain extent.  Difficulties are caused by
> substance abuse problems.

R. 177.  Dr. Fujiwaki then diagnosed Plaintiff as follows:  "AXIS 1: Depressive disorder, NOS

["not otherwise specified"]. Anxiety disorder, NOS.  Alcohol dependance.  Cannabis

dependance.  AXIS II:  Personality disorder, NOS with antisocial features.  AXIS III:  History of

neck and foot fracture.  Back problems."  R. 178.  He recommended that Plaintiff undergo

psychiatric, psychological and substance abuse treatment.  R. 178.

On August 31, 2009, Dr. Fujiwaki added an addendum to his report, amending his

Medical Source Statement to remove the sentence "He is not capable of dealing with stress and

needs supervision."  R. 180.

10

3.      *State Agency Expert Opinions*

a.      <u>Psychological Expert</u>

On September 11, 2009, state agency psychological expert Dr. E. Kamin reviewed the record and provided an opinion regarding the severity of Plaintiff's alleged mental impairments and Plaintiff's residual functional capacity ("RFC") . R. 185–201. Dr. Kamin stated that Plaintiff suffered from depressive disorder, anxiety disorder, and alcohol and cannabis dependance. R. 195. Dr. Kamin opined that Plaintiff had mild restrictions on his activities of daily living, as well as  mild difficulties in maintaining social functioning and concentration, persistence or pace. R. 195. Dr. Kamin noted no episodes of deterioration. R. 195.

A Mental Residual Functional Capacity Assessment was also completed by Dr. Kamin on September 11, 2009. R. 199. Dr. Kamin noted no limitations in the category of "Understanding and Memory." R. 199. In the category of "Sustained Concentration and Persistence," Dr. Kamin noted that Plaintiff was moderately limited in his "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," as well as "[t]he ability to work in coordination with or proximity to others without being distracted by them." R. 199. Plaintiff was not significantly limited in his "ability to sustain an ordinary routine without special supervision" and "make simple work-related decisions" R. 199. In the category of "Social Interaction," Dr. Kamin indicated that Plaintiff was not significantly limited in his ability to "interact appropriately with the general public," "accept instructions and respond appropriately to criticism from superiors," and "maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness." R. 200. Dr. Kamin indicated moderate limitations in Plaintiff's "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes." R. 200. Finally, with

respect to the category of "Adaptation," Dr. Kamin indicated that Plaintiff was markedly limited in his "ability to set realistic goals or make plans independently of others" and moderately limited in his "ability to respond appropriately to changes in the work setting." R. 200. Dr. Kamin concluded that Plaintiff's mental status was within normal limits, and that "although [Plaintiff] has difficulties caused by substance abuse problems, he remains capable of performing simple work." R. 201.

        4.    *Additional Medical Evidence*

To his Memorandum in Opposition to Defendant's Motion, Plaintiff attached an examination report dated January 20, 2012 from Dr. Robert London, a psychiatrist at the Institute for Family Health in Manhattan. The report indicates that, after an examination, Dr. London diagnosed plaintiff with post-traumatic stress disorder, mood disorder not otherwise specified, alcohol dependance, cannabis dependance and "[o]ther psychosocial and environmental problems." Pl.'s Mem. at 7–8. In light of his diagnosis, Dr. London opined that plaintiff was "[p]ermenantly disabled from work." Pl.'s Mem. at 8.

**C.**    **Plaintiff's Testimony at the Administrative Hearing**

After Plaintiff's application was initially denied on September 15, 2009, Plaintiff timely requested a hearing before an administrative law judge ("ALJ"). R. 85–86. On March 30, 2011, a hearing was conducted by ALJ Jerome Hornblass, at which Plaintiff appeared *pro se.* R. 51–76.

At the beginning of the hearing, prior to Plaintiff being sworn in, Plaintiff and ALJ Hornblass discussed a false arrest / malicious prosecution case brought by Plaintiff in 2000. R. 53–61. According to the Plaintiff, the conduct alleged in that case, which was later settled, gave rise to his PTSD. R. 53–61. ALJ Hornblass and Plaintiff also had a colloquy, quoted

extensively in the analysis section below, concerning whether Plaintiff would proceed without representation.  R. 53–61.  Ultimately, Plaintiff chose to proceed without representation.  R. 61.

After being sworn in, Plaintiff testified that he was born on January 7, 1974, and was thus 37 years old on the date of the hearing.  R. 62.  He stated that he had completed high school and had also attended college until he was arrested in August 2000 for criminal sale of a controlled substance, after which time he had not returned to school.  R. 62–63, 66.  Since 2000, according to Plaintiff, he had been arrested numerous times for criminal possession of a controlled substance.  R. 64.

Plaintiff testified that he smoked marijuana and had received drug treatment for his marijuana use.  R. 66.  He stated that, in addition to drug treatment, he would receive psychiatric therapy at the treatment facilities, in the form of monthly visits with a psychiatrist.  R. 66.  Plaintiff stated that his most recent therapy treatment had ended because of a "[m]iscommunication," but did not elaborate further and was not asked to.  R. 67.

Plaintiff stated that he had been hospitalized on January 1, 2004, due to "pretty much alcohol poisoning," but had never been hospitalized due to intoxication at any other time.  R. 67–68.  He also stated that he had never been hospitalized in a mental institution for any reason.  R. 68.

Plaintiff testified that he suffered from depression and that he had been suffering from depression since "that whole case," presumably referring to his 2000 false arrest / malicious prosecution case.  R. 68.  He stated that he had been diagnosed with PTSD by a psychiatrist named Robert O'Connor during his 2000 case and had since been re-diagnosed.  R. 69.

With respect to his family, Plaintiff stated that he had a mother who lived in Queens with whom he was "kind of estranged" and a sister who lived in Texas.  R. 69.  Plaintiff stated that he had lived in a subsidized apartment in Manhattan for 28 years.  R. 69.

Plaintiff testified that he had the capability to brush his teeth and shower every day, as well as prepare meals.  R. 70.  He stated that he used to engage in "hyperactive extreme sports," including skateboarding, but was unable to do so anymore because of back pain and other skateboarding-related injuries.  R. 70.  He also stated that he had been a bike messenger from 1995 through 2005, but no longer rode a bike.  R. 71.  He stated that he had difficulty walking, that he suffered pain and heard an audible "cracking" noise when doing so.  R. 71.  According to Plaintiff, this injury was "mostly from the skateboarding."  R. 71.  Plaintiff added that  "when [he] lost the physical ability to do those things, the release was more turning to alcohol, drugs, things like that."  R. 71.

Plaintiff testified that he still smoked marijuana and drank alcohol; in fact, he stated that he had consumed roughly 75 ounces of beer and smoked marijuana by himself the night prior to the hearing.  R. 73.  Plaintiff stated that he had recently begun taking medications for depression and anxiety.  R. 73.  He testified that he took Lexapro for his psychological problems, ibuprofen for his foot pain and a vitamin D supplement.  R. 75.

**D.**     **Denial of Plaintiff's Claim by ALJ and Appeals Council; Plaintiff's Initiation of Action Seeking Federal District Court Review**

By decision dated May 5, 2011, ALJ Hornblass determined that Plaintiff was not disabled within the meaning of the Act and denied Plaintiff's claim.  R. 13–24.  In sum, ALJ Hornblass found that although Plaintiff suffered from a disability, his substance abuse was a

14

contributing factor to the determination of his disability, rendering him ineligible for benefits under the Social Security Act.  R. 13–14.

ALJ Hornblass first determined that Plaintiff met the insured status requirement of the Act through September 30, 2011, and then applied the five-step analysis set forth in 20 C.F.R. §§ 404.1520, 416.920.  R. 15.

At step one, ALJ Hornblass found that Plaintiff had not engaged in substantial gainful activity since June 30, 2008, his alleged disability onset date.  R. 15.

At step two, ALJ Hornblass determined that Plaintiff suffered from the following severe impairments:

> alcohol dependance, cannabis dependance, depressive disorder NOS, anxiety disorder NOS, a history of right-sided sciatica, mild arthropathy of the first metatarsophalangeal joint of the right foot, residual pain from left ankle and knee strain resulting from a fall.

R. 16 (citing 20 C.F.R. 404.1520(c) , 416.920(c)).   Curiously, ALJ Hornblass did not address Plaintiff's allegations of PTSD.

At step three, ALJ Hornblass found that none of Plaintiff's impairments, either singly or in combination, met or equaled any of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  R. 16 (citing 20 C.F.R. 404.1520(d), 416.920(d)).  With respect to Plaintiff's mental impairments, which included his substance abuse issues, ALJ Hornblass found that they imposed no restrictions with respect to Plaintiff's activities of daily living, noting that Plaintiff's activities included  "cooking, cleaning, laundering, shopping, showering, grooming and dressing himself" as well as using public transportation.  R. 16.  ALJ Hornblass concluded that Plaintiff's mental impairments caused moderate difficulties with social functioning, citing to Dr. Fujiwaki's consultative examination.  R. 16.  With respect to Plaintiff's concentration,

persistence or pace, the ALJ also found that plaintiff suffered from mild difficulties, stating that Plaintiff had difficulty adhering to a schedule and keeping appointments; the ALJ further stated that "[d]ifficulties with attention and concentration are typically symptoms of substance abuse," and further opined that "perhaps . . . [Plaintiff] was less dysfunctional in this area at some times (perhaps when not using marijuana and/or alcohol) than at others." R. 16–17. Finally, the ALJ found that Plaintiff had suffered no episodes of mental decompensation. R. 17.

At step four, ALJ Hornblass found that Plaintiff retained the residual functional capacity to perform light work,[8] except that Plaintiff "has some difficulties responding appropriately to others in a work setting, dealing with routine work place stressors, and maintaining sufficient regular attendance to meet the expectations of the average employer." R. 17. He noted that it was "difficult if not impossible to separate [Plaintiff's] mental complaints from his substance abuse." R. 17. Turning to the medical opinion evidence, the ALJ gave "significant weight," though not controlling weight, to the opinions of Dr. Fujiwaki as well as the "FEGS examiners" as a collective. R. 19. The ALJ gave "some, but less weight" to Dr. Eyassu's opinion that Plaintiff was physically unrestricted, which he said was somewhat inconsistent with the record. R. 19. Similarly, the ALJ gave "some, but less weight" to the opinion of Dr. Kamin due to the fact that he was a non-examining source. R. 19. At the conclusion of step four, ALJ Hornblass

---

[8]     Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b).

determined that Plaintiff's non-exertional limitations, which included his substance abuse

problems, would prevent him perform performing any of his past relevant work.  R. 20.

At step five, ALJ Hornblass determined that there were no jobs that existed in the

national economy that Plaintiff would be capable of performing, given that his substance abuse

disorders "so narrow the range of work the claimant can perform that a finding of 'disabled' is

appropriate under the framework of this rule."  R. 20–21.

Having determined that Plaintiff was essentially totally disabled for purposes of the Act,

the ALJ turned to the issue of whether Plaintiff's substance abuse problems were material to the

determination of his disability, which would disqualify him from the receipt of disability

benefits.[9]  R. 21.  The ALJ then re-applied the five-step analytical framework while assuming the

absence of plaintiff's substance abuse problems.  Relying primarily on Dr. Fujiwaki's

consultative psychological assessment, the ALJ found that, if Plaintiff's substance abuse

problems ceased, he would continue to have severe physical impairments, but that mentally, he

would have only mild limitations in social functioning and no limitations with concentration,

_____

[9]     When there is medical evidence of an applicant's drug or alcohol abuse, the
"disability" inquiry does not end with the five-step analysis. See 20 C.F.R. §
416.935(a).  In 1996, Congress enacted the Contract with America Advancement
Act (the "CAAA"), which amended the Act by providing that "[a]n individual
shall not be considered . . . disabled . . . if alcoholism or drug addiction would . . .
be a contributing factor material to the Commissioner's determination that the
individual is disabled."  Pub.L. 104-121, 110 Stat. 847 (codified at 42 U.S.C. §
1382c (a)(3)(J)).  The critical question is "whether [ the SSA] would still find [the
claimant] disabled if [she] stopped using drugs or alcohol."  20 C.F.R. §
416.935(b)(1); see also 20 C.F.R. § 416.935(b)(2)(i) ("If [the Commissioner]
determine[s] that [ the claimant's] remaining limitations would not be disabling,
[he] will find that [the] drug addiction or alcoholism is a contributing factor
material to the determination of disability.").

Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 123 (2d Cir. 2012) cert. denied, 133 S. Ct. 2881
(U.S. 2013).  "[C]laimants bear the burden of proving DAA immateriality." Id.

persistence or pace.  R. 21.  Accordingly, ALJ Hornblass concluded that Plaintiff would be

capable of performing his past relevant light work as a betting clerk, bicycle messenger, retail

sales clerk and park enforcement worker, rendering him not disabled. R. 23.

Plaintiff requested review of the ALJ's decision by the Appeals Council, but the Appeals

Council denied his request on August 27, 2012.  R. 1–3.  The ALJ's May 5, 2011, decision thus

became the final decision of the Commissioner and thereby is subject to review in this federal

court action, which was commenced by Plaintiff on October 26, 2012.  Dkt. No. 2.

## III. <u>DISCUSSION</u>

**A.   <u>Legal Standards</u>**

1.   *<u>Standard of Federal District Court Review</u>*

Section 405(g) of Title 42 of the United States Code entitles a Social Security claimant to

seek judicial review of the Commissioner's final decision denying such a claimant's application

for disability benefits.  District courts are empowered "to enter, upon the pleadings and transcript

of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of

Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  "It is

not the function of a reviewing court to decide *de novo* whether a claimant was disabled."

<u>Melville v. Apfel</u>, 198 F.3d 45, 52 (2d Cir. 1999).  Rather, the court's review is limited to

"'determin[ing] whether there is substantial evidence supporting the Commissioner's decision

and whether the Commissioner applied the correct legal standard.'"  <u>Poupore v. Astrue</u>, 566 F.3d

303, 305 (2d Cir. 2009) (quoting <u>Machado v. Apfel</u>, 276 F.3d 103, 108 (2d Cir. 2002)).

2.   *<u>Determination of Statutory Disability</u>*

To qualify for benefits under the Act, a claimant must demonstrate that he is disabled. The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A).  In addition, a claimant is eligible for disability benefits under the Act only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The SSA uses the following five-step analysis to evaluate disability claims:

1.  The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.  If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.  If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations.  If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.  If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.  If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.  The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000).  In determining whether a claimant is

disabled, the Commissioner must consider "(1) the objective medical facts; (2) diagnoses or

medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by

the claimant or others; and (4) the claimant's educational background, age, and work

experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983); see also 20 C.F.R. §

404.1529.  "'[S]tatements about [a claimant's] pain or other symptoms will not alone establish

that [the claimant is] disabled.'"  Cruz v. Astrue, No. 06 Civ. 3670 (LTS)(DCF), 2009 WL

1024242, at *13 (S.D.N.Y. Apr. 9, 2009) (quoting 20 C.F.R. §§ 404.1529(a), 416.929(a)).

"Where an ALJ makes a credibility assessment and decides to discount a claimant's subjective

complaints of pain, the reviewing court must defer to that credibility assessment, as long as the

ALJ's findings are supported by substantial evidence."  Id.

    3.    *Substantial Evidence*

     "In determining whether the agency's findings are supported by substantial evidence,

'the reviewing court is required to examine the entire record, including contradictory evidence

and evidence from which conflicting inferences can be drawn.'"  Talavera v. Astrue, 697 F.3d

145, 151 (2d Cir. 2012) (quoting Mongeur, 722 F.2d at 1038).  Substantial evidence is "'more

than a mere scintilla'" and "'means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'"  Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 507 (2d Cir.

2009) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  The substantial evidence

standard is "even more" deferential than the "'clearly erroneous' standard."  Brault v. Soc. Sec.

Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012).  The reviewing court must defer to the

Commissioner's factual findings and the inferences drawn from those facts, and the

Commissioner's findings of fact are considered conclusive if they are supported by substantial evidence.  See 42 U.S.C. § 405(g); Shaw, 221 F.3d at 131.  Accordingly, "once an ALJ finds facts," the reviewing court "can reject those facts 'only if a reasonable factfinder would *have to conclude otherwise*.'"  Brault, 683 F.3d at 47 (quoting Warren v. Shalala, 29 F.3d 1287, 1290 (8th Cir. 1994)).

   4.   *Treating Physician Rule*

   In considering any medical opinions set forth in the administrative record, the ALJ should give the opinion of a claimant's treating physician "'controlling weight'" if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  Ocasio v. Colvin, No. 12-CV-6002 (JG), 2013 WL 1395846, at *9 (E.D.N.Y. Apr. 5, 2013) (quoting 20 C.F.R. § 404.1527(d)(2)).  A "'treating source'" is a claimant's "'own physician, psychologist, or other acceptable medical source who provides [a claimant], or has provided [a claimant] with medical treatment or evaluations and who has, or has had, an ongoing treatment relationship with [a claimant].'"[10]  Id. at *9 n.26 (quoting 20 C.F.R. § 404.1502).

   5.   *Duty to Develop Record*

   Given the "non-adversarial nature" of the administrative proceedings, the ALJ "has an obligation to develop the record . . . regardless of whether the claimant is represented by counsel."  Shaw, 221 F.3d at 131.  Because the "treating physician rule dovetails with the ALJ's

---

   [10] An "ongoing treatment relationship" exists where the claimant "see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)."  20 C.F.R. § 404.1502. The SSA "may consider an acceptable medical source who has treated or evaluated [the claimant] only a few times . . . to be [the claimant's] treating source if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)."  Id.

affirmative duty to develop the administrative record," the "duty of the ALJ is 'particularly important when it comes to obtaining information from a claimant's treating physician.'" Ocasio, 2013 WL 1395846, at *9 (quoting Devora v. Barnhart, 205 F. Supp. 2d 164, 172 (S.D.N.Y. 2002)).  Accordingly, the ALJ's obligation to develop the record "includes obtaining the treating physicians' assessments of the claimant's RFC." Id.  It is appropriate to "remand[] to the Commissioner with directions to develop the administrative record further and to reconsider" where necessary to ensure an accurate assessment of a claimant's entitlement to benefits based on a fully developed record.  Burger v. Astrue, 282 F. App'x 883, 885 (2d Cir. 2008).

**B.**     <u>**Analysis**</u>

Defendant argues that the Commissioner's decision correctly applied the applicable law and was supported by substantial evidence.  See Def.'s Mem. at 1.  Plaintiff argues that (1) the ALJ "did not give [him] a chance to have a representative at [his] hearing," (2) he was deprived of a full and fair hearing due to the ALJ's failure to develop the record in several respects, and (3) the ALJ's decision was not supported by substantial evidence.  See Pl.'s Mem. at 1–6.

1.     *Right to Representation*

In his decision denying benefits, ALJ Hornblass stated that "[a]lthough informed of the right to representation, the claimant chose to appear and testify without the assistance of an attorney or other representative." R. 13.  Plaintiff, in contrast, contends that the ALJ did not "give [him] a chance" to have a representative at his hearing.  Pl.'s Mem. at 2.

The Court of Appeals has set forth the following framework for analyzing claims of involuntary waiver of right to representation:

> Although a claimant does not have a constitutional right to counsel at a social security disability hearing, she does have a statutory and regulatory right to be represented should she choose to obtain counsel.  42 U.S.C. § 406; 20 C.F.R. § 404.1705.  If properly informed of this right, a claimant may waive it. . . .
>
> The applicable statute and regulations state that, when notifying a claimant of an adverse determination, the Commissioner of Social Security (or his agent for these purposes) must "notify [the] claimant in writing" of (1) her "options for obtaining [an] attorney[ ] to represent [her]" at her hearing, and (2) "the availability . . . of  . . . organizations which provide legal services free of charge" to "qualifying claimants." 42 U.S.C. §§ 406(c), 1383(d)(2)(D); see also 20 C.F.R. § 404.1706.  Moreover, at the hearing itself, "the ALJ must ensure that the claimant is aware of [her] right [to counsel]." Robinson v. Sec'y of Health & Human Servs., 733 F.2d 255, 257 (2d Cir.1984).

Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009).  Additionally, "[a]ny waiver of the claimant's right to counsel must be made knowingly and voluntarily." Rocker v. Apfel, 98 Civ. 9040 (WHP), 2000 WL 1459846, at *6 (S.D.N.Y. Sept. 29, 2000).  "Where the ALJ 'downplay[s] the benefits of counsel,' Santiago v. Apfel, No. 98 Civ. 9042(HB), 2000 WL 488467, at *5 (S.D.N.Y. Apr.25, 2000), or neglects to indicate clearly that the claimant has a right to representation, Collado, 2009 WL 2778664, at *10–11, the claimant's waiver is not adequately knowing." Martino ex rel. C.P. v. Astrue, 09 Civ. 6479 (KBF), 2012 WL 1506058, at *9 (S.D.N.Y. Apr. 27, 2012).

Here, the record makes clear that the Commissioner satisfied her duty under 42 U.S.C. §§ 406(c) and 1383(d)(2)(D) to notify the Plaintiff of his right to obtain representation for his hearing.  Indeed, on at least four separate occasions prior to his hearing, Plaintiff was notified in writing of his right to representation.  See R. 35–36, 79–84, 85–86, 87–94.[11]  However, with

---

[11] On September 15, 2009, when the SSA initially denied his application, it notified Plaintiff as follows:

**If You Want Help With Your Appeal**

23

respect to the latter part of the inquiry, namely, whether the ALJ ensured that Plaintiff's waiver

of his right to representation was voluntary, numerous deficiencies are apparent.   At the

beginning of the administrative hearing, before Plaintiff had been sworn in, he expressed

obvious confusion with the hearing process to the ALJ:

| | |
|---|---|
| Claimant: | So let me, you just want to have a discussion with me off the record or is this on the record? |
| ALJ: | I'm on the record now. |
| Claimant: | Is this actually a hearing? |
| ALJ: | Yes. |
| Claimant: | I basically had come today because I was scheduled for a hearing. I didn't have representation [p]er se for today.  I contacted my lawyer yesterday.  I went to his offices.  I contacted him actually Monday, and I went to his offices yesterday, Tuesday.  On |

---

You can have a friend, lawyer, or someone else help you.  There are groups that can help you find a lawyer or give you free legal services if you qualify.  There are also lawyers who do not charge unless you win your appeal.  Your local Social Security office has a list of groups that can help you with your appeal.

R. 81, see R. 79–84.  In a document dated October 23, 2009, entitled "Request for Hearing by Administrative Law Judge," an employee of the SSA memorialized Plaintiff's statements as follows: "I understand I have a right to be represented and that if I need representation, the Social Security office or hearing office can give me a list of legal referral and service organizations to assist me in locating a representative."  R. 85–86.  Plaintiff was again notified of his right to representation in a letter dated October 29, 2009, acknowledging that his request for a hearing was received; the letter also included a  three-page enclosure entitled "Your Right to Representation" (SSA Publication No. 05-10075), which provided further detail. R. 89–92. Finally, in a Notice of Hearing dated February 17, 2011, Plaintiff was advised as follows:

**You May Choose To Have A Person Represent You**

If you want to have a representative, please find one right away.  If you get a representative, you should show this notice to that person.  You or that person should also call this office to give us his or her name, address, and telephone number.

R. 29–30.  The Notice of Hearing also included another copy of "Your Right to Representation." R. 35–36.

24

Monday, he printed out a document for me.  It's dated March 28, 2011.

R. 53–54.  Plaintiff then gave the ALJ a letter prepared by an attorney, Mr. Fred Lichtmacher,

Esq., who had represented Plaintiff in his 2000 false arrest / malicious prosecution case.  R.

54–55, 223.  After a brief discussion of that case, the following colloquy took place:

| | |
|---|---|
| ALJ: | Do you have a letter from [Mr. Lichtmacher] saying that he wants to be your lawyer in this case? |
| Claimant: | No, what he did is he gave me that to give to you to present.  He advised me to adjourn and get a lawyer that's, he said, I don't want to be a guinea pig with you.  I do police brutality even though he has intimate knowledge of prior things which sets a precedent for a lot of things that are in my initial claim. |
| ALJ: | Yes. |
| Claimant: | That's not his cup of tea.  So he advised me to get a lawyer to represent me and get an adjournment. |
| ALJ: | Let me go over some issues here and you can make up your mind.  First, you can have a hearing. |
| Claimant: | This is the discussion part. |
| ALJ: | This is the discussion part.  The hearing is also, the rules of eviden[ce] don't apply.  So I say it's more discussion than a conversation.  You can have the hearing, and if there's anything missing from your documentary [sic], but I understand you submitted all of your documents. |
| Claimant: | What I have, you've got it.  It's been scanned those 50 pages. |
| ALJ: | I can have a conversation and if there's everything in here, then I can make a decision on it.  This is without representation. |
| Claimant: | I feel I have a lot of thorough evidence. |
| ALJ: | If you feel you do, if you want representation – |
| Claimant: | But I spoke to your secretary, Brenda, I asked her if it's necessarily advantageous to have a representative?  She said not necessarily. |

25

ALJ:            She did speak to me about it this morning.

Claimant:       Who did?

ALJ:            Brenda.  The conversation you had.

Claimant:       Really?  She remembered. It was like a month ago.  I think it was like the 7th.

ALJ:            She keeps notes.  She's excellent.

Claimant:       I made a note of the date too.

ALJ:            She's excellent.  She keeps notes.  If I put this off and I adjourn this, we won't hear this for another couple of months.

Claimant:       I know.  That's the thing.  I've been waiting two years too.

ALJ:            I'm already scheduled for July.

Claimant:       Thank you for being forthright and frank with me.  I appreciate it.

ALJ:            If you feel you have everything, we can rely on what we have here. I can make a decision saying you're disabled or you're not disabled.  You can then appeal my decision.  It's not the end.

Claimant:       It's not the end.

ALJ:            You can get a lawyer at that time if you want.  Some of them charge a fee, some of them don't charge a fee.

Claimant:       In the eventuality that your decision is negative and I appeal or the eventuality that I adjourn and get a new date, which is the more expedient of the two?

ALJ:            I think you want to move.  You don't want to be stationary.

Claimant:       That's why I came.

ALJ:            You have everything done.

Claimant:       I tried to be thorough.

| | |
|---|---|
| ALJ: | In three weeks, you'll have a decision.  Otherwise, you're talking about August, which is fine with me.  But you do have a right to appeal. |
| Claimant: | You say you had a conversation with Brenda and she recollected me asking her if it was more advantageous for me to have a representative or not. |
| ALJ: | I spoke to her this morning about it. |
| Claimant: | What was that?  She was just reminding you of me. |
| ALJ: | We review our cases and make sure we give attention to each case. |
| Claimant: | I remember asking her to put in a good word for me.  I don't know if she did.  So that's the conversation.  That's my option basically. |
| ALJ: | If you want to adjourn, I'll give you an adjournment.  If you want to proceed, I'll give you – |
| Claimant: | You see what I want to do.  You say, well, I have what I have here.  You can look over it and make your own decision. |
| ALJ: | We'll speak a little more, go into some more details. |
| Claimant: | I do want to move.  You are right in ascertaining that absolutely. |

R. 58–61.  After this colloquy, plaintiff was sworn in and his testimony was taken by the ALJ.

In <u>Santiago v. Apfel</u>, the court concluded that a Social Security claimant's waiver of her right to representation was not voluntary when made in the following manner:

| | |
|---|---|
| ALJ: | Now I see you are not represented by an attorney or a representative. |
| Claimant: | No. |
| ALJ: | When we sent you the notice of hearing we also sent a list of lawyers who will take the case for free. |
| Claimant: | Yes, but I spoke with my social worker and she had explained to me that when I received the hearing note to look for lawyer to go to their locations, but I call them and they told me that it was too late to take the case. |

27

| | |
|---|---|
| ALJ: | Let me tell you – |
| Claimant: | Because I was supposed to got to them ever since I appealed the beginning. |
| ALJ: | Now let me tell you what a lawyer can do. A lawyer can make arguments in your favor and a lawyer can also obtain medical records. My office can also obtain medical records. It is not necessary that you have a lawyer to have the, the hearing today. Tell me what it is that you wish to do? Do you wish to go ahead with the hearing today? |
| Claimant: | I don't know. |
| ALJ: | Well, the options you have is leaving here today and finding and [sic] lawyer and we will adjourn the case for three months, or we can have the hearing today and if you are not satisfied with the decision that I render, you can then appeal to the Appeals Council of Social Security and thereafter to the Federal Court and you can obtain a lawyer for either of those contingencies. |
| Claimant: | Okay. |
| ALJ: | So what is that you wish to do today? |
| Claimant: | For the hearing– |
| ALJ: | Do you wish to proceed with the hearing today? |
| Claimant: | Yes. |

Santiago, supra, 2000 WL 488467 at *4-*5.

Here, the ALJ's lapse arguably exceeds the conduct held improper by the court in

Santiago. Indeed, ALJ Hornblass did not make any effort to ascertain whether Plaintiff was

aware of his right to representation or of the benefits that having counsel would confer. In fact,

by informing Plaintiff that he had all of his evidence submitted, see R. 58-61, he did just the

opposite. ALJ Hornblass also did nothing to correct Plaintiff's misconception that having an

attorney was "not necessarily" advantageous, which appears to have arisen from a conversation

28

between Plaintiff and a member of ALJ Hornblass's staff.  Like Santiago, the ALJ's statements to Plaintiff that, in the event of an unfavorable decision  "[i]t's not the end" and that Plaintiff could "get a lawyer at that time" if he wanted to "minimized the benefits of a lawyer by suggesting that counsel could be obtained on appeal." Id. at *5.  Unsurprisingly, the ALJ did not mention that an appeal from an unfavorable decision would be subjected to a much less favorable standard of review.  Finally, the ALJ 's emphasis on the expediency of proceeding without an attorney, i.e., his statement  "I think you want to move.  You don't want to be stationary," R. 59–60, inappropriately appealed to Plaintiff's desire to conclude the matter and further interfered with Plaintiff's ability to voluntarily waive his right to counsel.  Accordingly, for all of the foregoing reasons, I respectfully recommend that your Honor conclude that Plaintiff did not knowingly waive right to representation.

Nevertheless, "[w]hile the ALJ's behavior was inadequate, remand is only appropriate when the absence of counsel prejudiced the claimant."  Colondres v. Barnhart, 04 Civ. 1841 (SAS), 2005 WL 106893, at *5 (S.D.N.Y. Jan. 18, 2005); see also Collado v. Astrue, 05-CV-3337 (KMK)(LMS), 2009 WL 2778664, at *2 (S.D.N.Y. Aug. 31, 2009).  "Accordingly, '[e]ven if the waiver is not deemed knowingly and voluntarily made, the reviewing court need not remand the case as long as the ALJ fully developed the record and based his decision on substantial evidence.'"  Martino, supra, 2012 WL 1506058, at *11 (S.D.N.Y. Apr. 27, 2012) (quoting Salomon v. Apfel, 99 Civ. 4250 (SAS), 2000 WL 776924, at *6 (S.D.N.Y. Jun. 15, 2000)).  Here, I conclude below that the ALJ failed to fully develop the administrative record, necessitating remand.  Accordingly, I respectfully recommend that, on remand, plaintiff be promptly re-advised of his right to obtain representation, and that any further waiver of that right be made explicitly.

29

2.     *"Full and Fair Hearing"*

Plaintiff next asserts that the ALJ did not "give [him] a full and fair hearing."  Pl.'s Mem.

at 2.  He argues that the ALJ failed to develop the record, specifically, that the ALJ he did not

"find out who [his] doctors were and ask them for reports about [his] health." Pl.'s Mem. at 4.

As noted above, an ALJ "has an obligation to develop the record . . . regardless of

whether the claimant is represented by counsel."  Shaw, 221 F.3d at 131.  Moreover, in cases

involving *pro se* disability claimants, the duties of an ALJ are heightened, and "[t]he ALJ must

'adequately protect a *pro se* claimant's rights by ensuring that all of the relevant facts are

sufficiently developed and considered' and by 'scrupulously and conscientiously prob[ing] into,

inquir[ing] of, and explor[ing] for all the relevant facts.'"  Moran v. Astrue, 569 F.3d 108, 113

(2d Cir. 2009), (quoting Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990)).  In Cabrera v. Astrue,

the court discussed several facets of an ALJ's heightened duties to *pro se* claimants:

> In order to ensure that the medical record is complete, "an ALJ must do more than
> merely request a *pro se* plaintiff's medical records for the period during which
> disability benefits are sought."  Almonte v. Apfel, No. 96 Civ. 1119, 1998 WL
> 150996, at *7 (S.D.N.Y.1998); see also Connor v. Barnhart, No. 02 Civ. 2156,
> 2003 WL 21976404, at *5 (S.D.N.Y. Aug, 18, 2003) ("'[R]aw data' or even
> complete medical records are insufficient by themselves to fulfill the ALJ's duty."
> (citations omitted)).  Rather, the ALJ must also "make every reasonable effort to
> obtain . . . a report that sets forth the opinion of that treating physician as to the
> existence, the nature and the severity of the claimed disability."  Peed v. Sullivan,
> 778 F.Supp. 1241, 1246 (E.D.N.Y. 1991); accord Suriel v. Commissioner of
> Social Security, No. CV-05-1218, 2006 WL 2516429, at *6 (E.D.N.Y. Aug. 29,
> 2006); Dimitriadis v. Barnhart, No. 02 Civ. 9203, 2004 WL 540493, at *9
> (S.D.N.Y. March 17, 2004); Valoy, 2004 WL 439424, at *7; Peralta v. Callahan,
> No. 97 Civ. 5174, 1999 WL 294722, at *5 (March 24, 1999).  At the very least,
> the ALJ has an obligation to inform the claimant of the lack of documentation and
> of her right to subpoena medical records and reports on her own.  See Cruz v.
> Sullivan, 912 F.2d 8, 12 (2d Cir. 1990) (remanding because ALJ "failed to advise
> [the plaintiff], a *pro se* claimant, that he should obtain a more detailed statement
> from [his treating physician]"); Jones v. Apfel, 66 F.Supp.2d at 539-40
> (remanding where ALJ failed to subpoena medical records, explain why records
> were necessary, or inform plaintiff that she could subpoena treating physicians'

testimony); <u>Mejias</u>, 1998 WL 651052, at *6 (remanding where ALJ failed to subpoena treating physician or "inform [the] plaintiff that she should-or even could-produce additional evidence or call her treating physicians as witnesses"); <u>Almonte</u>, 1998 WL 150996, at *7 ("Possible avenues the ALJ could have pursued included a subpoena, enforcement of the subpoena, and advice to the plaintiff of the importance of the evidence."); <u>Rodriguez v. Apfel</u>, No. 96 Civ. 1132, 1997 WL 691428, at *6 (S.D.N.Y. Nov. 4, 1997) ("At the very least, the ALJ should have informed [the plaintiff] of his right to subpoena and cross-examine witnesses."); <u>Carroll v. Secretary of Department of Health and Human Services</u>, 872 F.Supp. 1200, 1204-05 (S.D.N.Y. 1995) (remanding where ALJ subpoenaed treating physician's records but failed to enforce subpoena or inform plaintiff that she could obtain records independently or call physician to testify).

<u>Cabrera v. Astrue</u>, 06 Civ. 9918 (JCF), 2007 WL 2706276, at *8 (S.D.N.Y. Sept. 18, 2007)

<u>modified</u> <u>on</u> <u>reconsideration</u>, 06 Civ. 9918 (JCF), 2008 WL 144697 (S.D.N.Y. Jan. 16, 2008).

Here, minimal effort was made by the ALJ to obtain medical records on Plaintiff's behalf, as is evident from the absence from the record of virtually any evidence generated prior to plaintiff's alleged disability onset date.  This is perplexing, given that over the course of the disability application and appeals process, Plaintiff identified numerous medical professionals and treating sources from whom evidence might have been obtained to support his claims.[12]  As a result, the administrative record is devoid of evidence which would have permitted the ALJ to conduct a meaningful and thorough review of Plaintiff's claimed disabilities, rather than a review that relied almost exclusively on the findings of consultative examiners.

Perhaps the clearest example of the ALJ's failure to develop the administrative record concerns Dr. Lily Lam of Metropolitan Hospital Center, who Plaintiff identified as his treating

---

[12] The ALJ's statements to Plaintiff at the hearing that "I understand you submitted all of your documents," R. 58, and "You have everything done" R. 61, are troubling in this respect, and would undoubtedly give a *pro se* claimant a false impression regarding the ALJ's role in obtaining evidence.

31

physician in his initial application for disability benefits, R. 115, and who the Commissioner

acknowledges is "plaintiff's primary care physician." Def.'s Mem. at 9. Because Dr. Lam was

Plaintiff's treating physician, the ALJ was obligated to obtain not only medical records from Dr.

Lam, but also to procure "a report that set[] forth [her] opinion . . . as to the existence, the nature

and the severity of the claimed disabilit[ies]." Peed v. Sullivan, 778 F.Supp. 1241, 1246

(E.D.N.Y. 1991); see also Aceto v. Comm'r of Soc. Sec., No. 6:08-CV-169 (FJS), 2012 WL

5876640, at *16 (N.D.N.Y. Nov. 20, 2012) (finding that, because "the ALJ had nothing more

than treatment records and consultative reports to review, he had an affirmative duty to develop

the record and request that Plaintiff's treating physicians assess her RFC"); Felder v. Astrue, No.

10-CV-5747 (DLI), 2012 WL 3993594, at *11 (E.D.N.Y. Sept. 11, 2012) (noting that, while the

"absence of an RFC statement from the record does not necessarily make the record

incomplete," the "Commissioner has an affirmative duty to request RFC assessments from a

Plaintiff's treating sources despite what is otherwise a complete medical history"); Mezzacappa

v. Astrue, 749 F. Supp. 2d 192, 207 (S.D.N.Y. 2010) (noting that, "even when the claimant is

represented by counsel," ALJ is "'compel[led] . . . to obtain from the treating source expert

opinions as to the nature and severity of the claimed disability'" and finding that, "[a]lthough the

SSA twice attempted to contact [plaintiff's treating physician] so that he could provide a residual

functional capacity analysis of [plaintiff], that did not absolve the ALJ of his responsibility to

follow up with" treating physician) (quoting Oliveras v. Astrue, 07 Civ. 2841 (RMB)(JCF), 2008

WL 2262618, at *6 (S.D.N.Y. May 30, 2008) (Report & Recommendation), adopted by 2008

WL 2540816 (S.D.N.Y. June 25, 2008)); Kirton v. Astrue, No. 06-CV-4080 (KMK)(PED), 2009

WL 2252092, at *7 (S.D.N.Y. July 28, 2009) (finding that "medical documentation included in

the administrative record is insufficient to support the negative inference drawn by the ALJ

because Plaintiff's doctors were not asked to, and did not, provide any assessment of Plaintiff's

functional limitations" but rather "consist[ed] entirely of raw treatment records provided in

response to form letters from SSA requesting 'all medical records'") (Report &

Recommendation), adopted by 2009 WL 2252092.  No treatment records or medical opinions

from Dr. Lam appear in the administrative record, and Dr. Lam is not even mentioned in the

ALJ's decision.[13]

      The failure to obtain medical records from Dr. Lam alone would warrant remand, but

there are other conspicuous omissions from the record.  For instance, no attempt was made to

obtain treatment records from Beth Rabinove or Jennifer Hogan, two licensed social workers

who treated Plaintiff for substance abuse.  Presumably, such reports, if available, would have

spoken directly to the severity of Plaintiff's substance abuse problems, the very issue upon

which ALJ predicated his denial of disability benefits.  Similarly, no attempt was made to obtain

any records from Dr. Jorge Quintana or Dr. Gerard Solomon, who, according to Plaintiff, were

treating him for PTSD and anxiety in 2010 and had prescribed him Lexapro, an anti-anxiety

medication. R. 42–43.  Efforts to obtain reports from G. William Deegan, a social worker who

treated Plaintiff from 2000 through 2002 were abandoned[14] by the SSA and not re-initiated by

_____

[13] The only evidence that any attempt was made to obtain records from Dr. Lam is a
"Request for Medical Field Contact" form, dated June 25, 2009, sent from the New York State
Office of Temporary & Disability Assistance to Metropolitan Hospital Center.  R. 171.  On July
15, 2009, the notations "no option currently defined" and "no records" were written on the form.
R. 171.  No further inquiries or subpoenas appear to have been issued with respect to Dr. Lam,
nor did the ALJ "inform [Plaintiff] of the lack of documentation and of [his] right to subpoena
medical records and reports on [his] own." Cabrera v. Astrue, supra, 2007 WL 2706276, at *8.

[14] The record contains a Report of Contact prepared by disability analyst J. Kost on
September 9, 2009.  R. 140.  Kost reports the following:

      Made several attempts to contact G William Deegan by phone on 9/4, 9/8, and 9/9/09;
      leaving a request to call back regarding claimant, but no response.  Cancelled written

the ALJ.  Finally, despite Plaintiff's repeated insistence that he was diagnosed with PTSD by Dr.

Richard Kassner, a psychological expert retained by the City of New York in a 2000 civil rights

lawsuit, R. 55, 148,  no effort whatsoever appears to have been made by either the SSA or the

ALJ to contact Dr. Kassner to either corroborate or discredit Plaintiff's claim.

On remand, I respectfully recommend that the ALJ attempt to obtain medical records

from all of the treating sources identified by Plaintiff in his disability application.  Where

appropriate, medical opinion evidence should also be obtained.

    3.    _Substantial Evidence_

Because there is legal error requiring remand, it is unnecessary to determine whether the

ALJ's decision was supported by substantial evidence.  See Henderson v. Astrue, 07 Civ. 10564

(RMB)(HBP), 2011 WL 197210 at *20 (S.D.N.Y. Jan. 19, 2011).  Indeed, the ALJ's failure to

develop the administrative record would frustrate such an exercise.  Nevertheless, in the interest

of providing further guidance on remand, I briefly address two additional points.

First, despite the fact that Plaintiff alleged PTSD as a disabling impairment, R. 111, and

that Dr. Eyassu diagnosed him with the condition, R. 174, the ALJ made no mention of PTSD in

his decision.  On remand, the ALJ shall consider Plaintiff's allegations of PTSD along with any

medical evidence and opinions about the condition in the record and set forth his basis for his

determination regarding the severity of the condition.

Second, an internal memorandum promulgated by the Social Security Administration

concerning drug and alcohol abuse disorder ("DAA") states that "[w]hen it is not possible to

---

       request because the [sic] is no reason to expect Mr Deegan to respond regarding an
       individual seen 7 to 9 years ago.

R. 140.

separate mental restrictions and limitations imposed by the DAA and the various mental disorders shown by the evidence, a finding of 'not material' would be appropriate." Questions and Answers Concerning DAA from the 07/02/96 Teleconference–Medical Adjudicators, EM–96200 (Aug. 30, 1996).   Although the memorandum "does not have the force of law and is entitled to deference only insofar as it has the power to persuade," Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 125 (2d Cir. 2012) cert. denied, 133 S. Ct. 2881 (U.S. 2013), courts have not hesitated to remand on this basis.  See, e.g., Badgley v. Astrue, 07-CV-399C, 2009 WL 899432 (W.D.N.Y. Mar. 27, 2009); Frankhauser v. Barnhart, 403 F. Supp. 2d 261, 274 (W.D.N.Y. 2005).  Here, the ALJ stated that "[i]t is difficult if not impossible to separate the claimant's mental complaints from his substance abuse," but nevertheless determined that Plaintiff's substance abuse was material.  R. 17.  In doing so, he relied on only a single medical opinion, that of Dr. Fujiwaki, the consultative psychological examiner, who stated that Plaintiff's "[d]ifficulties are caused by substance abuse problems." R. 177.   The ALJ did not acknowledge or discuss the position advanced by Plaintiff, namely, that his substance abuse issues resulted from his attempts to cope with his PTSD.  Because the Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination," Selian v. Astrue, 708 F.3d 409, 419 (2d Cir. 2013), and because the ALJ's statement appears to conflict with the Social Security Administration's internal guidance, I respectfully recommend that on remand, the ALJ should obtain additional medical evidence regarding the nature of Plaintiff's substance abuse issues and how they might relate to his other alleged psychological conditions.

## IV.  CONCLUSION

For the reasons set forth above, I respectfully recommend that Defendant's motion for judgment on the pleadings be **DENIED** and that Plaintiff's motion for judgment on the pleadings be **GRANTED** to the extent that the case be **REMANDED** for further administrative proceedings consistent with this Report & Recommendation pursuant to 42 U.S.C. § 405(g), sentence four.

Dated: October 15, 2013
       White Plains, New York

Respectfully submitted,

Paul E. Davison
United States Magistrate Judge


**<u>NOTICE</u>**[15]

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days, plus an additional three (3) days, or a total of seventeen (17) days, from service of this Report and Recommendation to serve and file written objections. <u>See also</u> Fed. R. Civ. P. 6(a), (b), (d). Such objections, if any, along with any responses to the objections, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of the Honorable Vincent L. Briccetti, at the Honorable Charles L. Brieant, Jr. Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

---

[15] Due to a lapse of funding to the Department of Justice, all deadlines set forth herein are subject to the stay set forth in Standing Order M10-468, which appears at Docket No. 24.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Briccetti.